**THERRELL v. GERSTELL et al.**
**No. 6380.**

Circuit Court of Appeals, Fifth Circuit.
Jan. 12, 1932.

Rehearing Denied Feb. 18, 1932.

W. E. Walsh and E. P. Ellis, both of Miami, Fla., for appellant.

W. H. Burwell, J. N. Morris, and W. G. Ward, both of Miami, Fla., for appellees.

Before BRYAN, HUTCHESON, and WALKER, Circuit Judges.

HUTCHESON, Circuit Judge.

This is an appeal from an order entered in the bankrupt estate of Maude Brickell,

denying the petition of the liquidator of the failed Bank of Bay Biscayne for satisfaction out of the proceeds of the sale of lot 99, block B, Flagler, of the lien of the bank's mortgage. The order was based upon the finding of the referee, approved by the District Judge, that the mortgage had been satisfied and discharged by a settlement theretofore had between the trustees and the liquidator. The matter came up in the court below in this way:

On March 18, 1931, the trustees filed a petition to sell lot 99 free and clear of liens. It recited that the liquidator of the Bay Biscayne Bank claimed a mortgage on it to secure $10,500, but that the mortgage was invalid. The liquidator answered that he held a valid mortgage on lots 98 and 99, and, upon his prayer that lot 99 be sold and his claim upon it transferred to the proceeds, it was sold under an order providing that the proceeds should stand charged with the liquidator's claim in the same case as the lot had stood. On April 8 the liquidator filed his petition for satisfaction out of the proceeds. The trustees contested the claim on four grounds: (1) That the note and mortgage were given without consideration, in that the moneys had been really advanced by the bank upon a note and lien for the same amount upon lots 67 and 68, block B; (2) that the mortgage being without consideration, and within four months of bankruptcy, effected a preference; (3) that the debt and lien had been satisfied and discharged by an adjustment made in October, 1930, between the trustees and the liquidator in which the trustees had surrendered to the liquidator their claim upon an escrow fund amounting to $8,827 and a general deposit of $346 in exchange for the release and surrender of the mortgage debt and lien; (4) that, if the claim were valid at all, it was only to the extent of any balance remaining after the sums above referred to, aggregating $9,173, had been credited on the note as in fact and in law they should have been.

The following are the facts:

On July 26, 1928, Maude Brickell gave her unsecured demand note to the Bank of Bay Biscayne for $2,500. In August she made written request of the bank for a loan of $15,500 offering as security a mortgage on lots 98 and 99, block B, Flagler, and lots 4 and 5, White's addition. At the same time, and in consideration of the loan, and upon the agreement that the fund when received by the bank was to be applied on her indebtedness to the bank, whether secured or unsecured, the application of such credits to be left to the discretion of the bank, she agreed to execute, and did execute, an order on the Biscayne Trust Company:

"You hold the sum of $54,193.14 deposited by myself and other individuals as executors of the estate of Mary Brickell to protect an income tax lien * * * I am advised that collection will probably be waived * * * I am entitled to a ⅛ plus ⅓ of a ⅛ portion of these funds, * * * I have today borrowed certain funds from the Bank of Bay Biscayne and have pledged my interest in the deposit in your possession to retire the obligation. If and when the case is settled * * * you are authorized * * * to turn over the remainder to the Bank of Bay Biscayne for credit upon my obligations, whether secured or unsecured, application of the credits to be at their discretion."

In effecting the closure of the loan which was granted, she gave one note for $5,000, secured by the White lots, and two notes for $10,500 each, one secured by deed of trust on lots 67 and 68, and one secured by deed of trust on lots 98 and 99, block B, Flagler. Though both notes were dated August 14, 1928, they were executed on different dates. The one secured on lots 67 and 68 was given first, the one secured on lots 98 and 99 was given a little later to correct the mistake made in taking a mortgage on lots 67 and 68, which lots were already incumbered instead of as had been agreed, on lots 98 and 99, which were unincumbered. In November, 1928, an involuntary petition was filed against Maude Brickell and a receiver appointed. A contest ensued, and it was not until February 5, 1930, that she was adjudicated a bankrupt. In the meantime, however, the receiver made it his business to discover and develop the condition of the estate in his charge, and on July 18, 1929, he procured an order on the Bay Biscayne Bank requiring it to show what assets of Maude Brickell's it had and what she owed it. The report filed by the bank showed, among other things, the following: The receipt by them on February 23, 1929, of the Biscayne Trust Company's draft for $8,827.55, covering Maude Brickell's interest in the escrow fund, and the crediting of this sum against her aggregate indebtedness with the bank. That there was due it a principal balance of $625 on the demand note of July 26, a note for $2,500 dated October 16, 1928, a note for $5,000 dated August 4, 1928, and a note for $10,500 dated August 14, 1928. Of this note the report stated: "We hold a mortgage dated August 14, 1928 in the amount of

$10,500 encumbering Lots 98 and 99 Block B, Flagler. No payments have been made on this mortgage and the same secures a note in the amount of $10,500. The Bank of Bay Biscayne holds another mortgage bearing the same date as the one just mentioned and encumbering Lots 68 and 69. This mortgage was additional security to and secures the same note as the other $10,500 mortgage mentioned above." In June, 1930, both the Bank of Bay Biscayne and the Biscayne Trust Company failed, and a liquidator for each was appointed by the state comptroller. On August 28, 1930, the trustees of the Maude Brickell estate filed with the referee their petition for a summary turn-over order, requiring the Biscayne Trust Company to surrender to them the Maude Brickell escrow fund. The liquidator of the trust company answered, denying the trustees' interest therein and averring that the Bank of Bay Biscayne held its draft for the amount. That the matter in dispute was not one for a summary order, but could be disposed of only in a plenary suit with the liquidator of the bank a party. On September 20, 1930, the trustees filed their petition for authority to sell lots 67 and 68. The petition recited the existence of a valid first mortgage upon it, and that the Bank of Bay Biscayne was claiming an interest in the property by way of mortgage to secure a debt of $10,500. Of this mortgage claim it said: "Your petitioners deny the validity of said claim and that the Bank has a valid subsisting lien upon the land described."

To none of these proceedings was the Bank of Bay Biscayne or its liquidator made a party. It filed no pleadings, it presented no claim against the bankrupt estate, and, except by the report filed by it upon the order of the court, it made no appearance of any kind in the bankruptcy court. Matters standing thus, lots 67 and 68 which the trustees were desirous of selling, and their right to sell which was clouded by a mortgage in favor of the bank claimed by the bank in its report filed in the bankruptcy court as additional security to its mortgage on lots 98 and 99, and the Maude Brickell interest in the escrow fund, though in the possession of the bank through the trust company's draft issued upon her order, clouded by the claim of the trustees asserted in their petition for summary order, negotiations were set on foot between the bank's liquidator and the trustees, resulting in an agreement that the respective claims of the bank and of the trustees to the two properties, the lots and the escrow fund, should be washed out the one against the other, clearing the lots from the cloud of the bank's claim and the escrow fund from the cloud of the trustees' claim. At no time during these negotiations was any mention made of the debt or lien securing it against lots 98 and 99, though the schedules of the bankrupt showed the existence of this lien, and the report of the bank clearly set it out, while the schedules of the bankrupt showed no note or lien against lots 67 and 68, and the report of the bank claimed the lien, not as securing an independent note, but merely as additional security to the note secured by lots 98 and 99.

The agreement of settlement was evidenced by two instruments which were submitted to and approved by the referee, one a release by the trustees of their claim to the escrow fund in consideration of the discharge of the mortgage lien, the other a release and discharge by the liquidator of the mortgage on the lots. This release, after releasing and quitclaiming lots 67 and 68 to the trustees, in its final clause reads: "And I do further cancel and discharge the above mentioned mortgage and every part thereof, with the distinct understanding however, that this release and quitclaim of said property and cancellation and discharge of said mortgage shall not in any wise impair, alter or diminish any other claim or lien, if any, held by the undersigned as Liquidator as aforesaid, against any assets held by said trustees in bankruptcy, and this instrument is not intended as a release or discharge of any debt, and shall not be construed to be a release or discharge of any debt but it is intended to be and shall be construed as a full and complete release of the above property and any lien held or claimed by the undersigned."

On October 10, 1930, the bank cashed the draft on the trust company, and applied the proceeds as follows: $200 to attorney's fees, $719.30 in liquidation of demand note of July 26; $2,844.13 in liquidation of demand note of October 16; $3,030 credit on $5,000 White note and interest, $1,939 credit on interest on the $10,500 note. All of these notes to which the escrow fund was applied were validly secured by it, and, except as to the payment of the $200 attorneys fees, the bank had the right to make the application of the fund which it did. In addition to the documentary evidence above set out, oral testimony was offered, establishing that all of the transactions between Maude Brickell and the bank, including the giving of the two mortgages for the same debt, were good-faith transactions; that the bank never claimed but one indebtedness of $10,500, and that this fact had been made known to the trustees;

that the mortgage on lots 98 and 99 was supported by a present consideration; that it was executed to correct a mutual mistake, and it stands as to the debt it secures as though it had been first given. While the report of the bank on file in the estate does show that the bank was holding a mortgage on lots 67 and 68 as additional security to its mortgage on 98 and 99, this is not a correct statement of the situation. The facts are, as the officers of the bank and Maude Brickell testified at the hearing, and as the referee found, that it was intended that the papers on lots 98 and 99 should substitute the papers on lots 67 and 68, they to be returned to her; that neither Burwell nor Terry, who handled the settlement for the trustees and the liquidator, nor any one else, at any time mentioned or considered releasing the mortgage on lots 98 and 99, and that, though Burwell at first insisted, he later withdrew his insistence that the liquidator execute a straight release and satisfaction of the mortgage on lots 67 and 68, and that the note and mortgage on that property be surrendered to him, and the release, carefully prepared and as carefully worded by the liquidator so that nothing should be accepted or waived except the lien on the lots, was accepted and approved as written.

██ Upon these facts, the referee found directly in the teeth of the written release, on the faith of which the transaction was closed and of the whole case itself, that the liquidator of the bank had agreed, in exchange for the release by the trustees of their wholly untenable claim upon the escrow fund, that the bank would release and discharge a note and mortgage of unquestioned validity and ample security, amounting then to more than $12,000 on two lots, 98 and 99, which were not mentioned by any one in the course of the negotiations, and which Burwell testified he had supposed had no connection with the mortgage on 67 and 68, with which he was then alone concerned. Apart from the binding character of the release into which the negotiations between the parties had been integrated, the terms of which constituted the contract of settlement between the trustees and the liquidator, and therefore, in the absence of pleading and proof of fraud, accident, or mistake, precluded other proof of the agreement. South Florida Lbr. Mills v. Breuchaud (C. C. A.) 51 F.(2d) 490; Wigmore on Evidence (2d Ed.) vol. 5, § 2431; Barbour v. Poncelor, 203 Ala. 386, 83 So. 130, there is no warrant in the pleadings or in the facts for the finding of the referee, in effect that the liquidator of the bank, by asserting that it had a lien when it had none, had perpetrated a fraud on persons who dealing with him on the assumption that the lien was valid, gave him in exchange for a worthless lien something of value which they owned, and that he must now, to repair the mischief, be made to surrender a debt and lien which was at no time the subject of negotiation.

It is true enough that, at the time the release of the mortgage on lots 67 and 68 was executed, the bank had really no valid claim thereon; but it is also true that the trustees knew that its claim was invalid, for they so allege in their petition. It is also true that, invalid as the bank's claim was, the claim of the trustees to the escrow fund was no better, for the bank had rightful possession of that fund under a valid assignment, unaffected by the bankruptcy, securing valid debts, and it is perfectly clear that each of the negotiators knew that the other had a doubtful claim, or no claim at all, and that they were washing both out in order more quickly than by litigation to remove the clouds which prevented the immediate disposition by each of them of the property which each owned. No one testified that misrepresentations were made by any one to induce the making or the closing of the trade. All that has occurred here is that one unfounded claim has been washed out by another with a resultant benefit to both claimants, by removing from the just titles of each the cloud which the other's unfounded claim put upon it, enabling the trustees to sell the lots, the liquidator to apply the moneys to the bankrupt's debts.

The judgment of the court below denying the claim of the liquidator for satisfaction of his lien out of the proceeds derived from the sale of the lot to which in law and by the prior order of the court it had been transferred, finds no support in the record. The judgment appealed from is reversed, and the cause is remanded, with directions to grant the petition of the liquidator for satisfaction of the lien of the bank out of the proceeds of the sale after crediting on the note, as of October 10, 1930, the $200 erroneously paid out of the escrow fund as attorney's fees.

Reversed and remanded.